UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**FATBOY TRIPODS, LLC,**
**OPTICSWAP, LLC, and**
**NUGGETS NIGHT VISION, LLC**

       **Plaintiffs,**                       **Case No. 0:25-cv-61453**

**v.**

**CHETU, INC.,**

       **Defendant.**

_____/

## COMPLAINT

Plaintiffs FatBoy Tripods, LLC ("FatBoy"), OpticSwap, LLC ("OpticSwap") and Nuggets Night Vision, LLC ("NNV") (collectively "Plaintiffs") hereby alleges as follows:

## NATURE OF ACTION

1.      This is an action for breach of contract against Chetu.  Plaintiffs reserve the right to amend this filing to add other causes of action as information becomes available to its counsel, including potential claims for fraud and/or unlawful and deceptive business practices, as Chetu's actions appear part of a strategic pattern and practice of inducing customers into paying monthly development fees without either the competency or ability to deliver promised stable and non-defective software applications.

## PARTIES

2.      FatBoy Tripods, LLC is a Nebraska limited liability company with its principal place of business in Omaha, Nebraska.  All members of FatBoy reside in the state of Nebraska and/or Illinois.

1

3.     OpticSwap, LLC is a Nebraska limited liability company with its principal place of business in Omaha, Nebraska.  All members of OpticSwap reside in the state of Nebraska and/or Illinois.

4.     Nuggets Night Vision, LLC is an Illinois limited liability company with its principal place of business in Omaha, Nebraska.  All members of NNV reside in the state of Illinois.

5.     Chetu is a Florida corporation with its principal place of business in Plantation, Florida.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship in that Plaintiffs and their members are citizens of the State of Nebraska with their principal place of business in the state of Nebraska.  Whereas Chetu is a citizen of Florida with its principal places of business in Florida, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and in addition to other and further relief, declaratory relief is sought.

7.     Personal jurisdiction over Chetu exists, both as a matter of contract, because Chetu resides in this District, and because some or all of the acts or events giving rise to this action occurred in this judicial district.  *See* Agreement for Software Development and Maintenance Services (hereinafter, "Software Contract"), attached hereto as Exhibit A ("FatBoy Contract"), Exhibit B ("OpticSwap Contract") and Exhibit C ("NNV Contract"), Section 11 (Governing Law and Consent to Jurisdiction) ("The parties agree that any suit, action or other legal proceeding arising out of this Agreement shall be brought exclusively in Broward County, Florida.").

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because a

substantial part of the events, omissions, and breach giving rise to Plaintiffs claims, as described herein, occurred in this District, because Chetu resides in this District, and because the contract requires venue exclusively in this District (*See* Exhibits A, B and C at Section 11).

9.      Plaintiffs are properly joined in this action as they assert claims that arise out of the same the same transaction, occurrence, or series of transactions or occurrences and there are questions of law or fact common to all Plaintiffs that will arise in this action.

## FACTS COMMON TO ALL CAUSES OF ACTION

10.      Plaintiffs are related companies that provide product and support services to a wide array of hunting and shooting sports enthusiasts and law enforcement agencies throughout the United States including industry leading tripods and thermal optics.

11.      In December 2023, Plaintiffs first began discussions with Chetu concerning the latter providing a variety of software development and web services on projects for FatBoy Tripods, OpticSwap and Nuggets Night Vision.

12.      Chetu provided assurances both prior to the parties executing contracts, and post-contractual representations, that it had the competence to develop the software applications sought by Plaintiffs and that it could develop those applications within a matter of months.

13.      In January 2024 FatBoy Tripods, OpticSwap and Nuggets Night Vision each executed contracts with Chetu.  *See* Exhibit A ("FatBoy Contract"), Exhibit B ("OpticSwap Contract") and Exhibit C ("NNV Contract") (collectively the "Contracts").

14.      Each of Plaintiffs' contracts expressly state that it is the customer (*e.g.*, the Plaintiffs) that set the scope of work to be performed by Chetu and provides such scope would be provided after the execution of the contracts: "External scope for the work to be performed will be provided by Customer after this Agreement and may include analysis, design, development,

testing, installation and maintenance of software amongst other things and the parties on an ongoing basis will scope the individual milestones and deliverables." *See* Contracts at § 1. Moreover, each of the Plaintiffs' contracts further provide that it is the customers (*e.g.*, the Plaintiffs) that shall set the scope of work to be performed by Chetu under the contract as provided in the accompanying "Work Orders" to the contracts: "Description of Requested Services: Offshore consultants for hourly software support, maintenance, design or development services as are identified by Customer." *See* Contracts at Exhibit A (Work Order).

15. In this regard, each of the Plaintiffs clearly set forth the scope of work that Chetu was to provide and Chetu provided post-contract assurances that such scope of work and expected deliverables would be easily achieved.

16. Each of the Contracts further provided that a two-week notice was required prior to either side terminating the contract and/or Chetu ceasing work on the various projects:

> Term of Work Order: The term of this Work Order will commence on the Start Date indicated below and will continue until terminated by either party. Either party may terminate this Work Order for any reason or no reason whatsoever, at any time by providing a two (2) week advance written notice to the other party.

*See* Contracts at Exhibit A (Work Order).

## FatBoy Scope of Work and Chetu's Breach of Contract

17. When FatBoy came to Chetu it had well-defined parameters as to the scope of work it contracted Chetu to perform. Specifically, FatBoy contracted for Chetu to develop and implement a custom checkout solution within dealer portal scope and integrate the same into Fatboy's pre-existing well-developed website located at URL www.fatboytripods.com.

18. Through oral conversations, Zoom conference calls (recorded and in Chetu's control, custody and possession), emails and specific design documents, FatBoy identified specific design and/or development services that it was contracting Chetu to perform including but not

limited to designing/implementing tools within its existing website to allow FatBoy to charge select customers/dealers credit card fees, offer pay via ACH/wire transfers, and to disable financing options offered to regular clients through PayPal, Amazon, and other payment portals.

19.     Chetu made specific pre-contract *and* post-contract representations to FatBoy, both orally and in writing, that Chetu has the requisite skill and experience to very quickly and easily implement the requested custom checkout solution.

20.     Chetu stated that utilizing two developers that were represented as supposedly highly skilled competent and allegedly experienced with such custom checkout solutions the project would take approximately three months and cost between $20,000 to $30,000.

21.     However, to date, over a year after promising completion within a few months, Chetu has provided no useable, functioning or stable solution.

22.     Chetu invoiced FatBoy $79,440.00 for its alleged services, which has been paid in full.

23.     Notwithstanding, Chetu wrongfully terminated the contract without the requisite two weeks' notice and to date has provided no source code, no documentation and has refused to provide any additional support to FatBoy.

24.     Not only has FatBoy been bilked out of nearly $100,000 and received no value for the monies paid, but Chetu has failed to provide FatBoy a refund on the unused block of pre-paid hours Chetu demanded to be paid in advanced and has further failed to return FatBoy's initial $10,736 deposit.

**OpticSwap Scope of Work and Chetu's Breach of Contract**

25.     Pursuant to the parties' contract, Optic-Swap provided specific parameters as to the scope of work it contracted Chetu to perform.

26.     Specifically, OpticSwap contracted with Chetu to develop and implement a buy/sell website for both new and used thermals, night vision, and day optics that had the ability to expand into additional future items.

27.     OpticSwap detailed exacting parameters within the scope of work provided to Chetu to ensure a positive user experience, including but not limited to the contractual requirements for Chetu to build the website to include: (1) Specific dedicated features and functions for various transactions including but not limited to new items, used items and various levels of users with and without enrollment in related subscription services; (2) Specific cyber security features and validations; (3) Highly structured and controlled shipping requirements; (4) Payment systems and integrations linked to suppliers and manufacturers of optics; (5) The ability to have merchant processing to be done through Opticswap, which would collect payments and remit payments to sellers of items.

28.     Through oral conversations, Zoom conference calls (recorded and in Chetu's control, custody and possession), emails and specific design documents, OpticSwap identified in exacting detail the specific design and/or development services that it was contracting Chetu to perform.

29.     Chetu made specific pre-contract *and* post-contract representations to OpticSwap, both orally and in writing, that Chetu has the requisite skill and experience to very quickly and easily develop/implement the requested website solution.

30.     Chetu stated that utilizing two developers that were represented as supposedly highly skilled competent and allegedly experienced with such custom website the project would take approximately 3-4 months and cost $100,000.

31.     Chetu accepted a hard deadline at the project inception to have the contracted

website completed by August 1, 2024, which correlated to the start of most states hunting seasons in the United States in early September and would provide OpticSwap prime and strategic opportunity to launch the new website and gain the greatest market share possible.

32.     However, to date, over a year after promising completion within a few months, Chetu has provided no useable, functioning or stable solution.

33.     OpticSwap has paid Chetu nearly $300,000 and provided absolutely nothing of value in return let alone the functioning and stable website contracted for by OpticSwap.

34.     Notwithstanding, Chetu wrongfully terminated the contract without the requisite two weeks' notice and to date has provided no source code, no documentation and has refused to provide any additional support to OpticSwap.

### Nuggets Night Vision Scope of Work and Chetu's Breach of Contract

35.     Pursuant to the parties' contract, NNV provided specific parameters as to the scope of work it contracted Chetu to perform.

36.     Specifically, NNV contracted with Chetu to develop and implement a webinar page with specific functionality identified by NNV, including but not limited to having the webinar page designed to work with BigCommerce and fully integrate it so that NNV could offer subscription services to others who wanted to use the platform.

37.     Through oral conversations, Zoom conference calls (recorded and in Chetu's control, custody and possession), emails and specific design documents, NNV's identified in exacting detail the specific design and/or development services that it was contracting Chetu to perform.

38.     Chetu made specific pre-contract *and* post-contract representations to NNV, both orally and in writing, that Chetu has the requisite skill and experience to very quickly and easily

develop/implement the requested webinar solution.

39.     Chetu stated that utilizing developers that were represented as supposedly highly skilled competent and allegedly experienced with such custom applications the project would take approximately 3-4 months and cost between $50,000 to $70,000.

40.     However, to date, over a year after promising completion within a few months, Chetu has provided no useable, functioning or stable solution.

41.     NNV paid Chetu nearly $125,000 for its alleged services, which has been paid in full.

42.     Notwithstanding, Chetu wrongfully terminated the contract without the requisite two weeks' notice and to date has provided no usable source code, no documentation and has refused to provide any additional support to NNV.

43.     Not only has NNV been swindled out of over $125,000 and received no value for the monies paid, but Chetu has failed to provide NNV a refund on the unused block of pre-paid hours Chetu demanded to be paid in advanced and has further failed to return NNV's initial $4,928.00 deposit.

44.     Plaintiffs have have suffered substantial harm, in an amount to be proven at trial, but not less than the $500,000 collectively for the projects that have contracted Chetu to complete who despite taking all the payments made failed to deliver any usable, stable and functional product and producing software code that is entirely worthless.

45.     Each of the Plaintiffs have contracted with the undersigned and is obligated to pay the reasonable fees charged in prosecuting this case.

46.     To the extent any conditions precedent are claimed, they have been satisfied and/or otherwise waived.

## <u>COUNT I - BREACH OF CONTRACT (FatBoy Contract)</u>

47. The allegations of paragraphs 1-24 and 44-46 are incorporated by reference as if fully set forth herein.

48. FatBoy entered into a binding contract with Chetu attached hereto as Exhibit A.

49. Pursuant to the parties' contract and associated work order, through oral conversations, Zoom conference calls (recorded and in Chetu's control, custody and possession), emails and specific design documents, FatBoy identified specific design and/or development services that it was contracting Chetu to perform including but not limited to designing/implementing tools within its existing website which constitute the core scope of work Chetu was contracted to perform.

50. FatBoy paid all monies required and performed all obligations required of it under the Contract except to the extent that such performance was excused.

51. Chetu breached the parties' contract agreement by failing to deliver a defect-free, stable and otherwise useable end product as agreed by the Parties.

52. Chetu further breached the FatBoy Contract by terminating without providing the requisite two-week notice.

53. FatBoy has been damaged by the proximate result of Chetu's breaches.

WHEREFORE, FatBoy Tripods, LLC prays for judgment against Chetu as follows:

A) For compensatory damages;

B) For pre and post-judgment interest;

C) For reasonable attorneys' fees pursuant to Section 12(d) of the Parties' Contract.

D) For such other further relief as the Court deems appropriate and just.

## <u>COUNT II - BREACH OF CONTRACT (OpticSwap Contract)</u>

54.     The allegations of paragraphs 1-16 and 25-34 and 44-46 are incorporated by reference as if fully set forth herein.

55.     OpticSwap entered into a binding contract with Chetu attached hereto as Exhibit B.

56.     Pursuant to the parties' contract and associated work order, through oral conversations, Zoom conference calls (recorded and in Chetu's control, custody and possession), emails and specific design documents, OpticSwap identified specific design and/or development services that it was contracting Chetu to perform including but not limited to designing/implementing a buy/sell website for both new and used thermals, night vision, and day optics that had the ability to expand into additional future items tools within its existing website which constitute the core scope of work Chetu was contracted to perform.

57.     OpticSwap paid all monies required and performed all obligations required of it under the Contract except to the extent that such performance was excused.

58.     Chetu breached the parties' ~~contract~~ agreement by failing to deliver a defect-free, stable and otherwise useable end product as agreed by the Parties.

59.     Chetu further breached the OpticSwap Contract by terminating without providing the requisite two-week notice.

60.     OpticSwap has been damaged by the proximate result of Chetu's breaches.

WHEREFORE, OpticSwap, LLC prays for judgment against Chetu as follows:

A) For compensatory damages;

B) For pre and post-judgment interest;

C) For reasonable attorneys' fees pursuant to Section 12(d) of the Parties' Contract.

D) For such other further relief as the Court deems appropriate and just.

## **COUNT III - BREACH OF CONTRACT (Nuggets Night Vision Contract)**

61.     The allegations of paragraphs 1-16 and 35-46 are incorporated by reference as if fully set forth herein.

62.     NNV entered into a binding contract with Chetu attached hereto as Exhibit C.

63.     Pursuant to the parties' contract and associated work order, through oral conversations, Zoom conference calls (recorded and in Chetu's control, custody and possession), emails and specific design documents, NNV identified specific design and/or development services that it was contracting Chetu to perform including but not limited to designing/implementing a webinar site.

64.     NNV paid all monies required and performed all obligations required of it under the Contract except to the extent that such performance was excused.

65.     Chetu breached the Parties' contract agreement by failing to deliver a defect-free, stable and otherwise useable end product as agreed by the Parties.

66.     Chetu further breached the NNV Contract by terminating without providing the requisite two-week notice.

67.     NNV has been damaged by the proximate result of Chetu's breaches.

WHEREFORE, Nuggets Night Vision, LLC prays for judgment against Chetu as follows:

A) For compensatory damages;

B) For pre and post-judgment interest;

C) For reasonable attorneys' fees pursuant to Section 12(d) of the Parties' Contract.

D) For such other further relief as the Court deems appropriate and just.

**[signatures appear on next page]**

11

Date: July 18, 2025                                   Respectfully submitted,

                                                      /s/ William P. Cassidy, Jr.
                                                      William P. Cassidy, Jr., Esq. (FBN: 332630)
                                                      wcassidy@mckownbailey.com
                                                      MCKOWN BAILEY
                                                      1646 West Snow Avenue, Suite 36
                                                      Tampa, Florida 33306
                                                      Tel: 813.513.1843
                                                      *Counsel for FatBoy Tripods, LLC, OpticSwap,*
                                                      *LLC and Nuggets Night Vision, LLC*

# EXHIBIT A

Chetu, Inc.           Voice:   954 342 5676
1500 Concord Terrace,   Fax:     305 832 5987
Suite 100,            email:   info@chetu.com
Sunrise, FL 33323     Web:     www.chetu.com



AGREEMENT FOR SOFTWARE DEVELOPMENT AND MAINTENANCE SERVICES

This Agreement for Software development and Maintenance Services ("Agreement") is made this **2nd** day of _____**Janaury**_____ , 20 **24** between Chetu, Inc., a Florida Corporation, with a location at 1500 Concord Terrace, Suite 100, Sunrise, FL 33323 ("Chetu"), and _____**FatBoy Tripod, LLC**_____ , with primary location at _____**19910 Reese St, Elkhorn, NE, 68022, United States**_____ ("Customer").

### PREAMBLE

Whereas Customer, desires Chetu to provide consultants for software maintenance and development services; and

Whereas, Chetu provides onshore and offshore computer software design, development and maintenance services;

NOW THEREFORE, in exchange for the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1) Description of Services. From time to time, on an as needed basis, Chetu agrees to provide consultants on an hourly basis for information technology services as are identified to Chetu by Customer. The number of consultants, work hours, and price shall be described in greater detail on Work Orders to be attached hereto from time to time in the form of Exhibit A (the "Work Order"). External scope for the work to be performed will be provided by Customer after this Agreement and may include analysis, design, development, testing, installation and maintenance of software amongst other things and the parties on an ongoing basis will scope the individual milestones and deliverables. The scope for the services identified by Customer and milestones or deliverables scoped by parties are external from this Agreement.

2) Term of this agreement. The term of this Agreement will commence on the date first set forth above and will continue for a period of three (3) years ("Term"). If any Work Order issued hereunder remains in effect upon the expiration of the Term, the Term will automatically extend to cover the completion of such Work Order.

3) Third-party and other client approved costs. Customer shall be responsible for any third-party software or hardware, if needed. Some of these may include: Hardware (along with Network card(s) and other devices); Operating System; any other custom third-party software that might be needed.

4) Fees and Payment Terms. For the Services provided by Chetu, Customer agrees to pay Chetu an hourly rate as indicated on the Work Order(s), without reduction for any reason including for income tax withholdings or other deductions. Chetu shall invoice Customer periodically. Customer must pay Chetu's invoices no later than fifteen (15) days after receipt. Any amount past due in excess of fifteen (15) days will be subject to 1.5% interest per month. If any dispute, legal action or other proceeding is brought regarding Customer's non-payment of Chetu's invoices the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs, whether incurred before suit, during suit, or at the appellate level.

5) Non-Solicitation of Personnel. Customer agrees not to, directly or indirectly, whether for their own account or for the account of any other individual or entity, solicit, induce, enter into any agreement with, or attempt to influence any individual who is an employee, independent contractor, or consultant of or to Chetu at any time during the term of this Agreement and for a two (2) year period following termination, to terminate his/her employment or consulting relationship with Chetu or to become employed by or become a consultant to the Customer or any person or entity by which Customer is employed or otherwise associated with, or interfere in any other way with the employment or other relationship of any employee of or consultant to Chetu. If the Customer violates this clause, Customer shall be required to pay Chetu $50,000 as liquidated damages, not as a penalty, for each employee, independent contractor, or consultant. Customer agrees that these liquidated damages are reasonable based on Chetu's loss. Customer further agrees that Chetu shall be entitled to injunctive relief as well as damages for any violation by Customer of this clause.

6) Confidential Information. Each party ("Recipient") acknowledges that they have or will come into possession or knowledge in the course of performance of this Agreement, of certain material and information supplied by the other Party ("Owner") that is the Owner's confidential and proprietary information, including, but not limited to, Software, source code, trade secrets, processes, data, know-how, program codes, documentation, flowcharts, algorithms, marketing plans, software architecture, forecasts, unpublished financial statements, budgets, licenses, prices, costs, and employee, past, present and potential customer lists, etc. ("Confidential Information"). Confidential Information shall not include any information which: (i) is or becomes generally known to the public through no action on Recipient's part, (ii)

Recipient rightfully receives from a third party without restriction; (iii) Recipient develops it independently or already had knowledge of such information prior to disclosure by Owner; or (iii) is approved for release by written authorization of Owner. Upon termination of this Agreement or at any other time upon request, Recipient will promptly deliver to Owner all notes, memoranda, notebooks, drawings, records, reports, files, documented source codes and other documents (and all copies or reproductions of such materials) in its possession or under its control, whether prepared by Recipient or others, which contain Confidential Information. Recipient acknowledges that Confidential Information is the sole property of Owner. Recipient agrees that disclosure of such information to, or use by, third parties, either during or after this Agreement, will cause Owner irreparable damage. Recipient agrees to use best efforts to hold Confidential Information in the strictest confidence, not to make use of it other than for the performance of its obligations hereunder, to release it only to the Recipient's employees or contractors with a need to know such information and not to release or disclose it to any other party. Recipient further agrees not to release such information to any employee or contractor who is not bound by confidentiality, except as expressly permitted herein. Recipient will notify Owner in writing of any circumstances within its knowledge relating to any unauthorized possession, use, or knowledge of such Confidential Information. Neither party shall threaten the other party or make, post, publish or communicate to any person or entity or in any public forum any comments or statements (written or oral) that intentionally seek to denigrate or disparage, or are detrimental to, the reputation or stature of the other party or its businesses, or any of its employees, directors and officers and existing and prospective customers, suppliers, investors and other associated third parties.

7) Intellectual Property Rights; Assignment.  "Intellectual Property" shall mean: (i) works of authorship, improvements, innovations, technical information, software architecture, project plans, procedures, software, source code, flow charts, diagrams, firmware, technology and other intellectual property, as reflected in any form (including computer programs), including but not limited to, emails, documents, patent applications, patents, copyrights, trade secrets, trademarks, trade identities, trade dress, know-how, Confidential Information, and other proprietary information; and (ii) rights relating to possession, ownership and use of the foregoing, including without limitation, the right to license, sublicense, franchise, assign, divide, pledge, mortgage, sell, offer to sell, transfer, convey, grant, import, make or have made, enforce and register.

   a) Chetu Existing Intellectual Property.  "Chetu Existing Intellectual Property" means any Intellectual Property created, developed and reduced to practice by Chetu prior to the commencement of Services under this Agreement that are used by Chetu in creating, or are incorporated within, any Deliverable, the Services or other work performed under this Agreement. Chetu shall retain all right, title and ownership to any Chetu Existing Intellectual Property that is incorporated into any Deliverable or the Services.

   b) Chetu Created Intellectual Property.  "Chetu Created Intellectual Property" means any Intellectual Property created, developed or reduced to practice by or for Chetu in performing the Services under this Agreement. Chetu Created Intellectual Property shall be considered "work made for hire" under applicable copyright law and the copyright will, subject to Customer's compliance with the terms of this Agreement and upon receipt of payment in full, be owned solely and exclusively by Customer.

   c) Licenses.
      i)  Subject to Section 10, Chetu hereby grants to Customer a worldwide, irrevocable, non-exclusive, fully-paid up, royalty free, transferable and sub-licensable license to use, sell, and distribute the Chetu Existing Intellectual Property only insofar as is incorporated in, or required for

Customer to use, sell, or distribute, the Deliverables or any work product resulting from the Services.

ii) Except as otherwise specifically provided in this Agreement, each party acknowledges and agrees that no licenses or rights to any of the Intellectual Property of the one party are given or intended to be given to the other party.

8) **Legal disclaimer and indemnification.** Customer expressly acknowledges and agrees that Chetu is providing consultants for software development and maintenance services and not the end product(s) ("complete or any part of software developed as part of these services") itself. Chetu does not warrant that the operation of the end product(s) will be uninterrupted or error-free, or that defects in the end product(s) be fixed. The final software output shall be provided "as is", with all faults and without warranty of any kind. The entire risk as to the quality and performance of the end product(s) is with Customer. Should the end product(s) prove defective, Customer assumes the cost of all necessary servicing, repair or correction. Use of the end product(s), is at Customer's sole risk. Customer assumes full responsibility for the appropriate use of software and agrees to indemnify, defend and hold Chetu, its officers, directors, employees or agents (collectively "Indemnities") harmless from and against any and all claims, demands causes of action losses, expense (including attorneys' fees) or liability, from any and all claims or actions arising from use of end product(s).

9) **Limitation of Liability:** Under no circumstances, including negligence, will either party, be liable to the other or any other party for any incidental, special, indirect, reliance, punitive or consequential damages, including lost data, lost revenue, or lost profits, arising out of or relating to the software, developed or maintained as part of this agreement, or the services, even if such party has been advised of the possibility of such damages.

10) **Termination or Conclusion of Services.**

a) Should Customer be in breach of this Agreement (including, but not limited to, default in payment), Chetu may terminate this Agreement and/or Work Order(s) issued hereunder, at any time effective immediately and without notice.

b) When Chetu's services conclude or are terminated under this Agreement and/or Work Order, all unpaid charges shall become immediately due and payable. Customer will pay for all fees and costs incurred prior to conclusion or termination of services including the notice period.

c) If upon conclusion or termination of this Agreement and/or Work Order, Chetu has in its possession property of Customer, including source code, Chetu shall return all property to Customer upon receipt of Customer's payment of pending invoices.

11) **Governing Law and Consent to Jurisdiction.** This Agreement shall be governed by, and construed in accordance with the laws of the State of Florida. If any provision of this Agreement or the application thereof to any party or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. The parties agree that any suit, action or other legal proceeding arising out of this Agreement shall be brought exclusively in Broward County, Florida. Customer and Chetu consent and hereby waive any objection to jurisdiction (personal or subject matter) and/or venue in such court.

12) **General Provisions.**

a) **Waiver.** Neither party's failure to exercise any of its rights under this Agreement will constitute or be deemed a waiver or forfeiture of those rights.

b) **Force Majeure.** Neither party will be liable to the other for failure to perform its obligations hereunder if and to the extent that such failure to perform results from causes beyond its control, including, without limitation, strikes, lockouts, or other industrial disturbances; civil disturbances; fires; acts of God; acts of a public enemy; compliance with any regulations, order, or requirement of any governmental body or agency; or inability to obtain transportation or necessary materials in the open market.

c) **Notices.** All notices required under or regarding this Agreement from Customer to Chetu shall be in writing and will be considered proper if delivered by e-mail to contracts@chetu.com or facsimile to (305) 832-5987 with confirmation page.

d) Any breach of any provision of this Agreement, including non-payment for services, by either party shall entitle the other party to recover damages and injunctive relief. Customer and Chetu agree that because monetary damages are likely to be inadequate, the party shall be entitled to temporary injunctive relief (by providing to a court a likelihood of breach by Customer) and to permanent injunctive relief (by providing to a court such breach). If the first party is successful in recovering damages or obtaining injunctive relief, the second party agrees to be responsible for paying all of the first party's expenses in seeking such relief, including all costs of bringing suit and all reasonable attorneys' fees.

e) **Jury Waiver.** The parties hereby voluntarily, knowingly, irrevocably and unconditionally waive any right to jury trial in resolving any dispute (whether based upon contract, tort or otherwise) between or among them arising out of or in any way related to the Agreement, any documents or any relationship between them.

f) **Execution in Counterparts.** This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic transmission (e-mail) shall be as effective as delivery of a manually executed original counterpart of this Agreement. Delivery of a counterpart to this Agreement executed with an electronic signature shall be the same and as effective as a manually executed original counterpart of this Agreement.

g) **Customer Consent to Recording.** Chetu and Customer acknowledge and agree that the parties, including their agents, may from time to time have telephone communications while performing services under this Agreement and/or the parties' relationship. For quality assurance, Customer expressly consents to Chetu intercepting and recording any such communications.

h) **Customer Cooperation.** Customer shall cooperate with Chetu by providing: (i) timely responses to Chetu's inquiries and requests for approvals and authorizations, (ii) access to any information or materials reasonably requested by Chetu which are necessary or useful in connection with providing the services under this Agreement. Customer acknowledges and agrees that the Services are dependent upon the timeliness, completeness and accuracy of information provided by Customer and the knowledge and cooperation of the agents, employees or subcontractors ("Personnel") engaged or appointed by Customer who are selected by Customer to work with Chetu.

i) **Entire Agreement.** This Agreement and all exhibits hereto represent the entire understanding and agreement between the parties regarding the subject matter of this Agreement, and supersedes all other negotiations, understandings and representations (if any), whether oral or written, made by and between such parties. Customer expressly agrees that it did not rely upon statements or representations not contained within this Agreement. Customer hereby waives and releases all rights or claims of fraud and fraud in the inducement arising from any pre-contract representations. There have been no representations, express or implied, other than as set forth in this Agreement. The terms of this Agreement may be modified or changed only by a written agreement signed by all of the parties and which provides it is an amendment to it. The parties agree that Sections 5, 6 and 7 shall survive the termination of this Agreement.

j) **Representation on Authority of Parties/Signatories.** Each person signing this Agreement represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Agreement. Each party represents and warrants to the other that the execution and delivery of the Agreement and the performance of such party's obligations hereunder have been duly authorized and that the Agreement is a valid and legal agreement binding on such party and enforceable in accordance with its terms.

Chetu, Inc.

_____
Authorized Signature

Name:  Atal Bansal

Title:  CIO

Customer:

_____
Authorized Signature

Name:  J. CONNOR SHARP

Title:  MANAGING MEMBER

This document is valid only if approved by contracts@chetu.com via Chetu's RightSignature platform.
v. 061122

✓ Approved        NS

Exhibit "A"

## WORK ORDER

Pursuant to the terms and conditions set forth in the <u>Agreement for Software Development and Maintenance Services</u> (the "Master Agreement") between Chetu, Inc. ("Chetu") and <u>FatBoy Tripod, LLC</u> ("Customer"), Customer requests the following consultant(s) be provided by Chetu.

Term of Work Order: The term of this Work Order will commence on the Start Date indicated below and will continue until terminated by either party. Either party may terminate this Work Order for any reason or no reason whatsoever, at any time by providing a two (2) week advance written notice to the other party.

Billing Terms: Each consultant is allocated as a Full Time equivalent for this Work Order and billing is fixed to 8 hours per day. The consultant(s) work Monday through Friday and alternate Saturdays.

Description of Requested Services: Offshore consultants for hourly software support, maintenance, design or development services as are identified by Customer.

Number of Consultant(s): ____1____

Consultant Hourly Rate: $__28.00__/hr

Average Cost per Week: _____$1,232.00_____

Estimated Start Date: __01/08/2024__

Security Deposit: Customer agrees to pay Chetu a refundable deposit of $__4,928.00__ to begin performing under this Work Order. Since Chetu bills in arrears, Chetu will hold the Security Deposit, no interest to accrue, until termination of this Work Order; should Customer have any outstanding balance or invoice(s) at the time of termination, the Security Deposit will be applied as payment towards Customer's outstanding balance and/or invoice(s) and Chetu will refund the unapplied balance within 30 days after termination.

Approved and Accepted by:

Chetu:                                          Customer:

_____          _____
Authorized Signature                     Authorized Signature

Name: __Atal Bansal__                   Name: __J. CONNOR SHARP__

Title: __CIO__                              Title: __MANAGING MEMBER__

# citrix | RightSignature

## SIGNATURE CERTIFICATE



**REFERENCE NUMBER**
08BA9847-3FB8-44ED-BF7A-A77079E72D8D

---

### TRANSACTION DETAILS

**Reference Number**
08BA9847-3FB8-44ED-BF7A-A77079E72D8D

**Transaction Type**
Signature Request

**Sent At**
01/02/2024 16:19 EST

**Executed At**
01/02/2024 16:23 EST

**Identity Method**
email

**Distribution Method**
email

**Signed Checksum**
768a5475a4e02b5a09dcb1a1e16f607e20b1d9c636d7301084e78d19f00451ed

**Signer Sequencing**
Enabled

**Document Passcode**
Disabled

### DOCUMENT DETAILS

**Document Name**
Chetu - FatBoy Tripods, LLC Agreement

**Filename**
paperwork_ma_1wo_v2.pdf

**Pages**
3 pages

**Content Type**
application/pdf

**File Size**
341 KB

**Original Checksum**
4ad694d815959d83d8b4ac02f7ae7a45b1e51b1eef94375c7636fd9d463f65eb

## SIGNERS

| SIGNER | E-SIGNATURE | EVENTS |
|---|---|---|
| **Name**<br>Contracts TEam<br>**Email**<br>contracts@chetu.com<br>**Signer Sequence**<br>2<br>**Components**<br>2 | **Status**<br>signed<br>**Multi-factor Digital Fingerprint Checksum**<br>193db4997d4ec4c90b669bee4ed4a61402e3a899e930b480132306f0715a7201<br>**IP Address**<br>170.55.182.210<br>**Device**<br>Chrome via Windows | **Viewed At**<br>01/02/2024 16:22 EST<br>**Identity Authenticated At**<br>01/02/2024 16:23 EST<br>**Signed At**<br>01/02/2024 16:23 EST |
| **Name**<br>J.Connor Sharp<br>**Email**<br>connor@fatboytripods.com<br>**Signer Sequence**<br>1<br>**Components**<br>6 | **Status**<br>signed<br>**Multi-factor Digital Fingerprint Checksum**<br>0efb80ae0ce3981178f0083793b2d095e94d460f899143cfaee86cb32a00f3db<br>**IP Address**<br>207.177.50.50<br>**Device**<br>Chrome via Windows<br>**Drawn Signature**<br>**Signature Reference ID**<br>834F8532<br>**Signature Biometric Count**<br>2 | **Viewed At**<br>01/02/2024 16:21 EST<br>**Identity Authenticated At**<br>01/02/2024 16:21 EST<br>**Signed At**<br>01/02/2024 16:21 EST |
| **Name**<br>Chetu Sales<br>**Email**<br>et2rs@chetu.com<br>**Signer Sequence**<br>0<br>**Components**<br>11 | **Status**<br>signed<br>**Multi-factor Digital Fingerprint Checksum**<br>d5627ef78ba92f29638d9ee6bab0bd2aedf0e2dc3c78c618367cdcdf8c9b7990<br>**IP Address**<br>70.167.197.76<br>**Device**<br>Chrome via Windows | **Viewed At**<br>01/02/2024 16:20 EST<br>**Identity Authenticated At**<br>01/02/2024 16:21 EST<br>**Signed At**<br>01/02/2024 16:21 EST |

## AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 01/02/2024 16:19 EST | Chetu Sales (et2rs@chetu.com) created document 'paperwork_ma_1wo_v2.pdf' on Chrome via Windows from 70.167.197.76. |

| TIMESTAMP | AUDIT |
|---|---|
| 01/02/2024 16:19 EST | Chetu Sales (et2rs@chetu.com) was emailed a link to sign. |
| 01/02/2024 16:20 EST | Chetu Sales (et2rs@chetu.com) was emailed a reminder. |
| 01/02/2024 16:20 EST | Chetu Sales (et2rs@chetu.com) viewed the document on Chrome via Windows from 70.167.197.76. |
| 01/02/2024 16:21 EST | Chetu Sales (et2rs@chetu.com) authenticated via email on Chrome via Windows from 70.167.197.76. |
| 01/02/2024 16:21 EST | Chetu Sales (et2rs@chetu.com) signed the document on Chrome via Windows from 70.167.197.76. |
| 01/02/2024 16:21 EST | J.Connor Sharp (connor@fatboytripods.com) was emailed a link to sign. |
| 01/02/2024 16:21 EST | J.Connor Sharp (connor@fatboytripods.com) viewed the document on Chrome via Windows from 207.177.50.50. |
| 01/02/2024 16:21 EST | J.Connor Sharp (connor@fatboytripods.com) authenticated via email on Chrome via Windows from 207.177.50.50. |
| 01/02/2024 16:21 EST | J.Connor Sharp (connor@fatboytripods.com) signed the document on Chrome via Windows from 207.177.50.50. |
| 01/02/2024 16:21 EST | Contracts TEam (contracts@chetu.com) was emailed a link to sign. |
| 01/02/2024 16:22 EST | Contracts TEam (contracts@chetu.com) viewed the document on Chrome via Windows from 170.55.182.210. |
| 01/02/2024 16:23 EST | Contracts TEam (contracts@chetu.com) authenticated via email on Chrome via Windows from 170.55.182.210. |
| 01/02/2024 16:23 EST | Contracts TEam (contracts@chetu.com) signed the document on Chrome via Windows from 170.55.182.210. |

# EXHIBIT B

Chetu, Inc.    Voice:  954 342 5676
1500 Concord Terrace,    Fax:  305 832 5987
Suite 100,    email:  info@chetu.com
Sunrise, FL 33323    Web:  www.chetu.com



<u>AGREEMENT FOR SOFTWARE DEVELOPMENT AND MAINTENANCE SERVICES</u>

This Agreement for Software development and Maintenance Services ("Agreement") is made this **11th** day of _____ **March** _____ , 20 **24** between Chetu, Inc., a Florida Corporation, with a location at 1500 Concord Terrace, Suite 100, Sunrise, FL 33323 ("Chetu"), and _____ **Optic Swap** _____ , with primary location at _____ **19910 Reese St, Elkhorn, NE, 68022, United States** _____ ("Customer").

## PREAMBLE

Whereas Customer, desires Chetu to provide consultants for software maintenance and development services; and

Whereas, Chetu provides onshore and offshore computer software design, development and maintenance services;

NOW THEREFORE, in exchange for the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1) <u>Description of Services</u>. From time to time, on an as needed basis, Chetu agrees to provide consultants on an hourly basis for information technology services as identified to Chetu by Customer. The number of consultants, work hours, and price shall be described in greater detail on Work Orders to be attached hereto from time to time in the form of Exhibit A (the "Work Order"). External scope for the work to be performed will be provided by Customer after this Agreement and may include analysis, design, development, testing, installation and maintenance of software amongst other things and the parties on an ongoing basis will scope the individual milestones and deliverables. The scope for the services identified by Customer and milestones or deliverables scoped by parties are external from this Agreement.

2) <u>Term of this agreement</u>. The term of this Agreement will commence on the date first set forth above and will continue for a period of three (3) years ("Term"). If any Work Order issued hereunder remains in effect upon the expiration of such Term, the Term will automatically extend to cover the completion of such Work Order.

3) <u>Third-party and other client approved costs</u>. Customer shall be responsible for any third-party software or hardware, if needed. Some of these may include: Hardware (along with Network card(s) and other devices); Operating System; any other custom third-party software that might be needed.

4) <u>Fees and Payment Terms</u>. For the Services provided by Chetu, Customer agrees to pay Chetu an hourly rate as indicated on the Work Order(s), without reduction for any reason including for income tax withholdings or other deductions. Chetu shall invoice Customer periodically. Customer must pay Chetu's invoices no later than fifteen (15) days after receipt. Any amount past due in excess of fifteen (15) days will be subject to 1.5% interest per month. If any dispute, legal action or other proceeding is brought regarding Customer's non-payment of Chetu's invoices the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs, whether incurred before suit, during suit, or at the appellate level.

5) <u>Non-Solicitation of Personnel</u>. Customer agrees not to, directly or indirectly, whether for their own account or for the account of any other individual or entity, solicit, induce, enter into any agreement with, or attempt to influence any individual who is an employee, independent contractor, or consultant of or to Chetu at any time during the term of this Agreement and for a two (2) year period following termination, to terminate his/her employment or consulting relationship with Chetu or to become employed by or become a consultant to the Customer or any person or entity by which Customer is employed or otherwise associated with, or interfere in any other way with the employment or other relationship of any employee of or consultant to Chetu. If the Customer violates this clause, Customer shall be required to pay Chetu $50,000 as liquidated damages, not as a penalty, for each employee, independent contractor, or consultant. Customer agrees that these liquidated damages are reasonable based on Chetu's loss. Customer further agrees that Chetu shall be entitled to injunctive relief as well as damages for any violation by Customer of this clause.

6) <u>Confidential Information</u>. Each party ("Recipient") acknowledges that they have or will come into possession or knowledge in the course of performance of this Agreement, of certain material and information supplied by the other Party ("Owner") that is the Owner's confidential and proprietary information, including, but not limited to, Software, source code, trade secrets, processes, data, know-how, program codes, documentation, flowcharts, algorithms, marketing plans, software architecture, forecasts, unpublished financial statements, budgets, licenses, prices, costs, and employee, past, present and potential customer lists, etc. ("Confidential Information"). Confidential Information shall not include any information which: (i) is or becomes generally known to the public through no action on Recipient's part, (ii)

Recipient rightfully receives from a third party without restriction; (iii) Recipient develops it independently or already had knowledge of such information prior to disclosure by Owner; or (iii) is approved for release by written authorization of Owner. Upon termination of this Agreement or at any other time upon request, Recipient will promptly deliver to Owner all notes, memoranda, notebooks, drawings, records, reports, files, documented source codes and other documents (and all copies or reproductions of such materials) in its possession or under its control, whether prepared by Recipient or others, which contain Confidential Information. Recipient acknowledges that Confidential Information is the sole property of Owner. Recipient agrees that disclosure of such information to, or use by, third parties, either during or after this Agreement, will cause Owner irreparable damage. Recipient agrees to use best efforts to hold Confidential Information in the strictest confidence, not to make use of it other than for the performance of its obligations hereunder, to release it only to the Recipient's employees or contractors with a need to know such information and not to release or disclose it to any other party. Recipient further agrees not to release such information to any employee or contractor who is not bound by confidentiality, except as expressly permitted herein. Recipient will notify Owner in writing of any circumstances within its knowledge relating to any unauthorized possession, use, or knowledge of such Confidential Information. Neither party shall threaten the other party or make, post, publish or communicate to any person or entity or in any public forum any comments or statements (written or oral) that intentionally seek to denigrate or disparage, or are detrimental to, the reputation or stature of the other party or its businesses, or any of its employees, directors and officers and existing and prospective customers, suppliers, investors and other associated third parties.

7) <u>Intellectual Property Rights; Assignment</u>. "Intellectual Property" shall mean: (i) works of authorship, improvements, innovations, technical information, software architecture, project plans, procedures, software, source code, flow charts, diagrams, firmware, technology and other intellectual property, as reflected in any form (including computer programs), including but not limited to, emails, documents, patent applications, patents, copyrights, trade secrets, trademarks, trade identities, trade dress, know-how, Confidential Information, and other proprietary information; and (ii) rights relating to possession, ownership and use of the foregoing, including without limitation, the right to license, sublicense, franchise, assign, divide, pledge, mortgage, sell, offer to sell, transfer, convey, grant, import, make or have made, enforce and register.

    a) <u>Chetu Existing Intellectual Property</u>. "Chetu Existing Intellectual Property" means any Intellectual Property created, developed and reduced to practice by Chetu prior to the commencement of Services under this Agreement that are used by Chetu in creating, or are incorporated within, any Deliverable, the Services or other work performed under this Agreement. Chetu shall retain all right, title and ownership to any Chetu Existing Intellectual Property that is incorporated into any Deliverable or the Services.

    b) <u>Chetu Created Intellectual Property</u>. "Chetu Created Intellectual Property" means any Intellectual Property created, developed or reduced to practice by or for Chetu in performing the Services under this Agreement. Chetu Created Intellectual Property shall be considered "work made for hire" under applicable copyright law and the copyright will, subject to Customer's compliance with the terms of this Agreement and upon receipt of payment in full, be owned solely and exclusively by Customer.

    c) <u>Licenses</u>.

      i)   Subject to Section 10, Chetu hereby grants to Customer a worldwide, irrevocable, non-exclusive, fully-paid up, royalty free, transferable and sub-licensable license to use, sell, and distribute the Chetu Existing Intellectual Property only insofar as it is incorporated in, or required for

Customer to use, sell, or distribute, the Deliverables or any work product resulting from the Services.

ii) Except as otherwise specifically provided in this Agreement, each party acknowledges and agrees that no licenses or rights to any of the Intellectual Property of the one party are given or intended to be given to the other party.

8) <u>Legal disclaimer and indemnification.</u> Customer expressly acknowledges and agrees that Chetu is providing consultants for software development and maintenance services and not the end product(s) ("complete or any part of software developed as part of these services") itself. Chetu does not warrant that the operation of the end product(s) will be uninterrupted or error-free, or that defects in the end product(s) be fixed. The final software output shall be provided "as is", with all faults and without warranty of any kind. The entire risk as to the quality and performance of the end product(s) is with Customer. Should the end product(s) prove defective, Customer assumes the cost of all necessary servicing, repair or correction. Use of the end product(s), is at Customer's sole risk. Customer assumes full responsibility for the appropriate use of software and agrees to indemnify, defend and hold Chetu, its officers, directors, employees or agents (collectively "Indemnities") harmless from and against any and all claims, demands causes of action losses, expense (including attorneys' fees) or liability, from any and all claims or actions arising from use of end product(s).

9) <u>Limitation of Liability:</u> Under no circumstances, including negligence, will either party, be liable to the other or any other party for any incidental, special, indirect, reliance, punitive or consequential damages, including lost data, lost revenue, or lost profits, arising out of or relating to the software, developed or maintained as part of this agreement, or the services, even if such party has been advised of the possibility of such damages.

10) <u>Termination or Conclusion of Services.</u>

a) Should Customer be in breach of this Agreement (including, but not limited to, default in payment), Chetu may terminate this Agreement and/or Work Order(s) issued hereunder, at any time effective immediately and without notice.

b) When Chetu's services conclude or are terminated under this Agreement and/or Work Order, all unpaid charges shall become immediately due and payable. Customer will pay for all fees and costs incurred prior to conclusion or termination of services including the notice period.

c) If upon conclusion or termination of this Agreement and/or Work Order, Chetu has in its possession property of Customer, including source code, Chetu shall return all property to Customer upon receipt of Customer's payment of pending invoices.

11) <u>Governing Law and Consent to Jurisdiction.</u> This Agreement shall be governed by, and construed in accordance with the laws of the State of Florida. If any provision of this Agreement or the application thereof to any party or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. The parties agree that any suit, action or other legal proceeding arising out of this Agreement shall be brought exclusively in Broward County, Florida. Customer and Chetu consent and hereby waive any objection to jurisdiction (personal or subject matter) and/or venue in such court.

12) <u>General Provisions.</u>

a) <u>Waiver.</u> Neither party's failure to exercise any of its rights under this Agreement will constitute or be deemed a waiver or forfeiture of those rights.

b) <u>Force Majeure.</u> Neither party will be liable to the other for failure to perform its obligations hereunder if and to the extent that such failure to perform results from causes beyond its control, including, without limitation, strikes, lockouts, or other industrial disturbances; civil disturbances; fires; acts of God; acts of a public enemy; compliance with any regulations, order, or requirement of any governmental body or agency; or inability to obtain transportation or necessary materials in the open market.

c) <u>Notices.</u> All notices required under or regarding this Agreement from Customer to Chetu shall be in writing and will be considered

proper if delivered by e-mail to <u>contracts@chetu.com</u> or facsimile to (305) 832-5987 with confirmation page.

d) Any breach of any provision of this Agreement, including non-payment for services, by either party shall entitle the other party to recover damages and injunctive relief. Customer and Chetu agree that because monetary damages are likely to be inadequate, the party shall be entitled to temporary injunctive relief (by providing to a court a likelihood of breach by Customer) and to permanent injunctive relief (by providing to a court such breach). If the first party is successful in recovering damages or obtaining injunctive relief, the second party agrees to be responsible for paying all of the first party's expenses in seeking such relief, including all costs of bringing suit and all reasonable attorneys' fees.

e) <u>Jury Waiver.</u> The parties hereby voluntarily, knowingly, irrevocably and unconditionally waive any right to jury trial in resolving any dispute (whether based upon contract, tort or otherwise) between or among them arising out of or in any way related to the Agreement, any documents or any relationship between them.

f) <u>Execution in Counterparts.</u> This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic transmission (e-mail) shall be as effective as delivery of a manually executed original counterpart of this Agreement. Delivery of a counterpart to this Agreement executed with an electronic signature shall be the same and as effective as a manually executed original counterpart of this Agreement.

g) <u>Customer Consent to Recording.</u> Chetu and Customer acknowledge and agree that the parties, including their agents, may from time to time have telephone communications while performing services under this Agreement and/or the parties' relationship. For quality assurance, Customer expressly consents to Chetu intercepting and recording any such communications.

h) <u>Customer Cooperation.</u> Customer shall cooperate with Chetu by providing: (i) timely responses to Chetu's inquiries and requests for approvals and authorizations, (ii) access to any information or materials reasonably requested by Chetu which are necessary or useful in connection with providing the services under this Agreement. Customer acknowledges and agrees that the Services are dependent upon the timeliness, completeness and accuracy of information provided by Customer and the knowledge and cooperation of the agents, employees or subcontractors ("Personnel") engaged or appointed by Customer who are selected by Customer to work with Chetu.

i) <u>Entire Agreement.</u> This Agreement and all exhibits hereto represent the entire understanding and agreement between the parties regarding the subject matter of this Agreement, and supersedes all other negotiations, understandings and representations (if any), whether oral or written, made by and between such parties. Customer expressly agrees that it did not rely upon statements or representations not contained within this Agreement. Customer hereby waives and releases all rights or claims of fraud and fraud in the inducement arising from any pre-contract representations. There have been no representations, express or implied, other than as set forth in this Agreement. The terms of this Agreement may be modified or changed <u>only</u> by a written agreement signed by all of the parties and which provides it is an amendment to it. The parties agree that Sections 5, 6 and 7 shall survive the termination of this Agreement.

j) <u>Representation on Authority of Parties/Signatories.</u> Each person signing this Agreement and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Agreement. Each party represents and warrants to the other that the execution and delivery of the Agreement and the performance of such party's obligations hereunder have been duly authorized and that the Agreement is a valid and legal agreement binding on such party and enforceable in accordance with its terms.

Chetu, Inc.

_____
Authorized Signature

Name:  <u>Atal Bansal</u>

Title:  <u>CIO</u>

Customer:

_____
Authorized Signature

Name:  <u>Casey Cornwell</u>

Title:  <u>President</u>

**Exhibit "A"**

## <u>WORK ORDER</u>

Pursuant to the terms and conditions set forth in the <u>Agreement for Software Development and Maintenance Services</u> (the "Master Agreement") between Chetu, Inc. ("Chetu") and <u>                Optic Swap                 </u> ("Customer"), Customer requests the following consultant(s) be provided by Chetu.

Term of Work Order: The term of this Work Order will commence on the Start Date indicated below and will continue until terminated by either party. Either party may terminate this Work Order for any reason or no reason whatsoever, at any time by providing a two (2) week advance written notice to the other party.

Billing Terms: Each consultant is allocated as a Full Time equivalent for this Work Order and billing is fixed to 8 hours per day. The consultant(s) work Monday through Friday and alternate Saturdays.

Description of Requested Services: Offshore consultants for hourly software support, maintenance, design or development services as are identified by Customer.

Number of Consultant(s): <u>   3   </u>

Consultant Hourly Rate: $<u> 28.00 </u>/hr

Average Cost per Week: <u>   $3,696.00   </u>

Estimated Start Date: <u> 03/21/2024 </u>

Security Deposit: Customer agrees to pay Chetu a refundable deposit of $<u> 14,784.00 </u> to begin performing under this Work Order. Since Chetu bills in arrears, Chetu will hold the Security Deposit, no interest to accrue, until termination of this Work Order; should Customer have any outstanding balance or invoice(s) at the time of termination, the Security Deposit will be applied as payment towards Customer's outstanding balance and/or invoice(s) and Chetu will refund the unapplied balance within 30 days after termination.

Approved and Accepted by:

Chetu:                                            Customer:

_____     _____
Authorized Signature                          Authorized Signature

Name: <u> Atal Bansal       </u>     Name: <u>  Casey Cornwell  </u>

Title: <u>  CIO            </u>     Title: <u>     President   </u>

# citrix | RightSignature

## SIGNATURE CERTIFICATE



**REFERENCE NUMBER**
FDD82D18-ED32-4FC6-B737-F56CDDC8C963

---

| TRANSACTION DETAILS | DOCUMENT DETAILS |
|---|---|
| **Reference Number**<br>FDD82D18-ED32-4FC6-B737-F56CDDC8C963 | **Document Name**<br>Chetu - Optic Swap Agreement |
| **Transaction Type**<br>Signature Request | **Filename**<br>paperwork_ma_1wo_v2.pdf |
| **Sent At**<br>03/11/2024 13:54 EDT | **Pages**<br>3 pages |
| **Executed At**<br>03/11/2024 14:38 EDT | **Content Type**<br>application/pdf |
| **Identity Method**<br>email | **File Size**<br>341 KB |
| **Distribution Method**<br>email | **Original Checksum**<br>4ad694d815959d83d8b4ac02f7ae7a45b1e51b1eef94375c7636fd9d463f65eb |
| **Signed Checksum**<br>52375f1df49d5e07247bc08d4a7818a57b84d69c613a2f81caa07aec55354751 | |
| **Signer Sequencing**<br>Enabled | |
| **Document Passcode**<br>Disabled | |

## SIGNERS

| SIGNER | E-SIGNATURE | EVENTS |
|---|---|---|
| **Name**<br>Contracts TEam<br>**Email**<br>contracts@chetu.com<br>**Signer Sequence**<br>2<br>**Components**<br>2 | **Status**<br>signed<br>**Multi-factor Digital Fingerprint Checksum**<br>986a74e930d7cd20672f36de2284888d210b206d1b9fe25d3feb1da5a9d6477d<br>**IP Address**<br>170.55.182.210<br>**Device**<br>Chrome via Windows | **Viewed At**<br>03/11/2024 14:22 EDT<br>**Identity Authenticated At**<br>03/11/2024 14:38 EDT<br>**Signed At**<br>03/11/2024 14:38 EDT |
| **Name**<br>Casey Cornwell<br>**Email**<br>casey@fatboytripods.com<br>**Signer Sequence**<br>1<br>**Components**<br>6 | **Status**<br>signed<br>**Multi-factor Digital Fingerprint Checksum**<br>e46b14e08617da0f195773e190df43c0a9a4db2c734c8a24a85fae2662c89d53<br>**IP Address**<br>216.138.45.136<br>**Device**<br>Chrome via Mac<br>**Drawn Signature**<br>**Signature Reference ID**<br>C69B16E1<br>**Signature Biometric Count**<br>2 | **Viewed At**<br>03/11/2024 13:56 EDT<br>**Identity Authenticated At**<br>03/11/2024 13:56 EDT<br>**Signed At**<br>03/11/2024 13:56 EDT |
| **Name**<br>Chetu Sales<br>**Email**<br>et2rs@chetu.com<br>**Signer Sequence**<br>0<br>**Components**<br>11 | **Status**<br>signed<br>**Multi-factor Digital Fingerprint Checksum**<br>099bb70efc2d545555b1d32e27c6680febde5d503b91815b0103ea3f7d1fdc1a<br>**IP Address**<br>70.167.197.76<br>**Device**<br>Chrome via Windows | **Viewed At**<br>03/11/2024 13:54 EDT<br>**Identity Authenticated At**<br>03/11/2024 13:55 EDT<br>**Signed At**<br>03/11/2024 13:55 EDT |

## AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 03/11/2024 13:54 EDT | Chetu Sales (et2rs@chetu.com) created document 'paperwork_ma_1wo_v2.pdf' on Chrome via Windows from 70.167.197.76. |

| TIMESTAMP | AUDIT |
|---|---|
| 03/11/2024 13:54 EDT | Chetu Sales (et2rs@chetu.com) was emailed a link to sign. |
| 03/11/2024 13:54 EDT | Chetu Sales (et2rs@chetu.com) was emailed a reminder. |
| 03/11/2024 13:54 EDT | Chetu Sales (et2rs@chetu.com) viewed the document on Chrome via Windows from 70.167.197.76. |
| 03/11/2024 13:55 EDT | Chetu Sales (et2rs@chetu.com) authenticated via email on Chrome via Windows from 70.167.197.76. |
| 03/11/2024 13:55 EDT | Chetu Sales (et2rs@chetu.com) signed the document on Chrome via Windows from 70.167.197.76. |
| 03/11/2024 13:55 EDT | Casey Cornwell (casey@fatboytripods.com) was emailed a link to sign. |
| 03/11/2024 13:56 EDT | Casey Cornwell (casey@fatboytripods.com) viewed the document on Chrome via Mac from 216.138.45.136. |
| 03/11/2024 13:56 EDT | Casey Cornwell (casey@fatboytripods.com) authenticated via email on Chrome via Mac from 216.138.45.136. |
| 03/11/2024 13:56 EDT | Casey Cornwell (casey@fatboytripods.com) signed the document on Chrome via Mac from 216.138.45.136. |
| 03/11/2024 13:56 EDT | Contracts TEam (contracts@chetu.com) was emailed a link to sign. |
| 03/11/2024 14:22 EDT | Contracts TEam (contracts@chetu.com) viewed the document on Chrome via Windows from 170.55.182.210. |
| 03/11/2024 14:38 EDT | Contracts TEam (contracts@chetu.com) authenticated via email on Chrome via Windows from 170.55.182.210. |
| 03/11/2024 14:38 EDT | Contracts TEam (contracts@chetu.com) signed the document on Chrome via Windows from 170.55.182.210. |

# EXHIBIT C

Chetu, Inc.
1500 Concord Terrace,
Suite 100,
Sunrise, FL 33323

Voice: 954 342 5676
Fax: 305 832 5987
email: info@chetu.com
Web: www.chetu.com



AGREEMENT FOR SOFTWARE DEVELOPMENT AND MAINTENANCE SERVICES

This Agreement for Software development and Maintenance Services ("Agreement") is made this **5th** day of _____ **January** _____, 20 **24** between Chetu, Inc., a Florida Corporation, with a location at 1500 Concord Terrace, Suite 100, Sunrise, FL 33323 ("Chetu"), and _____ **Nuggets Night Vision LLC** _____, with a primary location at _____ **1301 County Rd 2353 N, Mendon, IL 62351, United States** _____ ("Customer").

**PREAMBLE**

Whereas Customer, desires Chetu to provide consultants for software maintenance and development services; and

Whereas, Chetu provides onshore and offshore computer software design, development and maintenance services;

NOW THEREFORE, in exchange for the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1) Description of Services. From time to time, on an as needed basis, Chetu agrees to provide consultants on an hourly basis for information technology services as are identified to Chetu by Customer. The number of consultants, work hours, and price shall be described in greater detail on Work Orders to be attached hereto from time to time in the form of Exhibit A (the "Work Order"). External scope for the work to be performed will be provided by Customer after this Agreement and may include analysis, design, development, testing, installation and maintenance of software amongst other things and the parties on an ongoing basis will scope the individual milestones and deliverables. The scope for the services identified by Customer and milestones or deliverables scoped by parties are external from this Agreement.

2) Term of this agreement. The term of this Agreement will commence on the date first set forth above and will continue for a period of three (3) years ("Term"). If any Work Order issued hereunder remains in effect upon the expiration of the Term, the Term will automatically extend to cover the completion of such Work Order.

3) Third-party and other client approved costs. Customer shall be responsible for any third-party software or hardware, if needed. Some of these may include: Hardware (along with Network card(s) and other devices); Operating System; any other custom third-party software that might be needed.

4) Fees and Payment Terms. For the Services provided by Chetu, Customer agrees to pay Chetu an hourly rate as indicated on the Work Order(s), without reduction for any reason including for income tax withholdings or other deductions. Chetu shall invoice Customer periodically. Customer must pay Chetu's invoices no later than fifteen (15) days after receipt. Any amount past due in excess of fifteen (15) days will be subject to 1.5% interest per month. If any dispute, legal action or other proceeding is brought regarding Customer's non-payment of Chetu's invoices the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs, whether incurred before suit, during suit, or at the appellate level.

5) Non-Solicitation of Personnel. Customer agrees not to, directly or indirectly, whether for their own account or for the account of any other individual or entity, solicit, induce, enter into any agreement with, or attempt to influence any individual who is an employee, independent contractor, or consultant of or to Chetu at any time during the term of this Agreement and for a two (2) year period following termination, to terminate his/her employment or consulting relationship with Chetu or to become employed by or become a consultant to the Customer or any person or entity by which Customer is employed or otherwise associated with, or interfere in any other way with the employment or other relationship of any employee of or consultant to Chetu. If the Customer violates this clause, Customer shall be required to pay Chetu $50,000 as liquidated damages, not as a penalty, for each employee, independent contractor, or consultant. Customer agrees that these liquidated damages are reasonable based on Chetu's loss. Customer further agrees that Chetu shall be entitled to injunctive relief as well as damages for any violation by Customer of this clause.

6) Confidential Information. Each party ("Recipient") acknowledges that they have or will come into possession or knowledge in the course of performance of this Agreement, of certain material and information supplied by the other Party ("Owner") that is the Owner's confidential and proprietary information, including, but not limited to, Software, source code, trade secrets, processes, data, know-how, program codes, documentation, flowcharts, algorithms, marketing plans, software architecture, forecasts, unpublished financial statements, budgets, licenses, prices, costs, and employee, past, present and potential customer lists, etc. ("Confidential Information"). Confidential Information shall not include any information which: (i) is or becomes generally known to the public through no action on Recipient's part, (ii)

Recipient rightfully receives from a third party without restriction; (iii) Recipient develops it independently or already had knowledge of such information prior to disclosure by Owner; or (iii) is approved for release by written authorization of Owner. Upon termination of this Agreement or at any other time upon request, Recipient will promptly deliver to Owner all notes, memoranda, notebooks, drawings, records, reports, files, documented source codes and other documents (and all copies or reproductions of such materials) in its possession or under its control, whether prepared by Recipient or others, which contain Confidential Information. Recipient acknowledges that Confidential Information is the sole property of Owner. Recipient agrees that disclosure of such information to, or use by, third parties, either during or after this Agreement, will cause Owner irreparable damage. Recipient agrees to use best efforts to hold Confidential Information in the strictest confidence, not to make use of it other than for the performance of its obligations hereunder, to release it only to the Recipient's employees or contractors with a need to know such information and not to release or disclose it to any other party. Recipient further agrees not to release such information to any employee or contractor who is not bound by confidentiality, except as expressly permitted herein. Recipient will notify Owner in writing of any circumstances within its knowledge relating to any unauthorized possession, use, or knowledge of such Confidential Information. Neither party shall threaten the other party or make, post, publish or communicate to any person or entity or in any public forum any comments or statements (written or oral) that intentionally seek to denigrate or disparage, or are detrimental to, the reputation or stature of the other party or its businesses, or any of its employees, directors and officers and existing and prospective customers, suppliers, investors and other associated third parties.

7) Intellectual Property Rights; Assignment. "Intellectual Property" shall mean: (i) works of authorship, improvements, innovations, technical information, software architecture, project plans, procedures, software, source code, flow charts, diagrams, firmware, technology and other intellectual property, as reflected in any form (including computer programs), including but not limited to, emails, documents, patent applications, patents, copyrights, trade secrets, trademarks, trade identities, trade dress, know-how, Confidential Information, and other proprietary information; and (ii) rights relating to possession, ownership and use of the foregoing, including without limitation, the right to license, sublicense, franchise, assign, divide, pledge, mortgage, sell, offer to sell, transfer, convey, grant, import, make or have made, enforce and register.

a) Chetu Existing Intellectual Property. "Chetu Existing Intellectual Property" means any Intellectual Property created, developed and reduced to practice by Chetu prior to the commencement of Services under this Agreement that are used by Chetu in creating, or are incorporated within, any Deliverable, the Services or other work performed under this Agreement. Chetu shall retain all right, title and ownership to any Chetu Existing Intellectual Property that is incorporated into any Deliverable or the Services.

b) Chetu Created Intellectual Property. "Chetu Created Intellectual Property" means any Intellectual Property created, developed or reduced to practice by or for Chetu in performing the Services under this Agreement. Chetu Created Intellectual Property shall be considered "work made for hire" under applicable copyright law and the copyright will, subject to Customer's compliance with the terms of this Agreement and upon receipt of payment in full, be owned solely and exclusively by Customer.

c) Licenses.

i) Subject to Section 10, Chetu hereby grants to Customer a worldwide, irrevocable, non-exclusive, fully-paid up, royalty free, transferable and sub-licensable license to use, sell, and distribute the Chetu Existing Intellectual Property only insofar as it is incorporated in, or required for

Customer to use, sell, or distribute, the Deliverables or any work product resulting from the Services.

   ii)   Except as otherwise specifically provided in this Agreement, each party acknowledges and agrees that no licenses or rights to any of the Intellectual Property of the one party are given or intended to be given to the other party.

8) <u>Legal disclaimer and indemnification</u>. Customer expressly acknowledges and agrees that Chetu is providing consultants for software development and maintenance services and not the end product(s) ("complete or any part of software developed as part of these services") itself. Chetu does not warrant that the operation of the end product(s) will be uninterrupted or error-free, or that defects in the end product(s) be fixed. The final software output shall be provided "as is", with all faults and without warranty of any kind. The entire risk as to the quality and performance of the end product(s) is with Customer. Should the end product(s) prove defective, Customer assumes the cost of all necessary servicing, repair or correction. Use of the end product(s), is at Customer's sole risk. Customer assumes full responsibility for the appropriate use of software and agrees to indemnify, defend and hold Chetu, its officers, directors, employees or agents (collectively "Indemnities") harmless from and against any and all claims, demands causes of action losses, expense (including attorneys' fees) or liability, from any and all claims or actions arising from use of end product(s).

9) <u>Limitation of Liability</u>: Under no circumstances, including negligence, will either party, be liable to the other or any other party for any incidental, special, indirect, reliance, punitive or consequential damages, including lost data, lost revenue, or lost profits, arising out of or relating to the software, developed or maintained as part of this agreement, or the services, even if such party has been advised of the possibility of such damages.

10) <u>Termination or Conclusion of Services</u>.
   a)   Should Customer be in breach of this Agreement (including, but not limited to, default in payment), Chetu may terminate this Agreement and/or Work Order(s) issued hereunder, at any time effective immediately and without notice.
   b)   When Chetu's services conclude or are terminated under this Agreement and/or Work Order, all unpaid charges shall become immediately due and payable. Customer will pay for all fees and costs incurred prior to conclusion or termination of services including the notice period.
   c)   If upon conclusion or termination of this Agreement and/or Work Order, Chetu has in its possession property of Customer, including source code, Chetu shall return all property to Customer upon receipt of Customer's payment of pending invoices.

11) <u>Governing Law and Consent to Jurisdiction</u>. This Agreement shall be governed by, and construed in accordance with the laws of the State of Florida. If any provision of this Agreement or the application thereof to any party or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. The parties agree that any suit, action or other legal proceeding arising out of this Agreement shall be brought exclusively in Broward County, Florida. Customer and Chetu consent and hereby waive any objection to jurisdiction (personal or subject matter) and/or venue in such court.

12) <u>General Provisions</u>.
   a)   <u>Waiver</u>. Neither party's failure to exercise any of its rights under this Agreement will constitute or be deemed a waiver or forfeiture of those rights.
   b)   <u>Force Majeure</u>. Neither party will be liable to the other for failure to perform its obligations hereunder if and to the extent that such failure to perform results from causes beyond its control, including, without limitation, strikes, lockouts, or other industrial disturbances; civil disturbances; fires; acts of God; acts of a public enemy; compliance with any regulations, order, or requirement of any governmental body or agency; or inability to obtain transportation or necessary materials in the open market.
   c)   <u>Notices</u>. All notices required under or regarding this Agreement from Customer to Chetu shall be in writing and will be considered proper if delivered by e-mail to <u>contracts@chetu.com</u> or facsimile to (305) 832-5987 with confirmation page.

   d)   Any breach of any provision of this Agreement, including non-payment for services, by either party shall entitle the other party to recover damages and injunctive relief. Customer and Chetu agree that because monetary damages are likely to be inadequate, the party shall be entitled to temporary injunctive relief (by providing to a court a likelihood of breach by Customer) and to permanent injunctive relief (by providing to a court such breach). If the first party is successful in recovering damages or obtaining injunctive relief, the second party agrees to be responsible for paying all of the first party's expenses in seeking such relief, including all costs of bringing suit and all reasonable attorneys' fees.

   e)   <u>Jury Waiver</u>. The parties hereby voluntarily, knowingly, irrevocably and unconditionally waive any right to jury trial in resolving any dispute (whether based upon contract, tort or otherwise) between or among them arising out of or in any way related to the Agreement, any documents or any relationship between them.

   f)   <u>Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic transmission (e-mail) shall be as effective as delivery of a manually executed original counterpart of this Agreement. Delivery of a counterpart to this Agreement executed with an electronic signature shall be the same and as effective as a manually executed original counterpart of this Agreement.

   g)   <u>Customer Consent to Recording</u>. Chetu and Customer acknowledge and agree that the parties, including their agents, may from time to time have telephone communications while performing services under this Agreement and/or the parties' relationship. For quality assurance, Customer expressly consents to Chetu intercepting and recording any such communications.

   h)   <u>Customer Cooperation</u>. Customer shall cooperate with Chetu by providing: (i) timely responses to Chetu's inquiries and requests for approvals and authorizations, (ii) access to any information or materials reasonably requested by Chetu which are necessary or useful in connection with providing the services under this Agreement. Customer acknowledges and agrees that the Services are dependent upon the timeliness, completeness and accuracy of information provided by Customer and the knowledge and cooperation of the agents, employees or subcontractors ("Personnel") engaged or appointed by Customer who are selected by Customer to work with Chetu.

   i)   <u>Entire Agreement</u>. This Agreement and all exhibits hereto represent the entire understanding and agreement between the parties regarding the subject matter of this Agreement, and supersedes all other negotiations, understandings and representations (if any), whether oral or written, made by and between such parties. Customer expressly agrees that it did not rely upon statements or representations not contained within this Agreement. Customer hereby waives and releases all rights or claims of fraud and fraud in the inducement arising from any pre-contract representations. There have been no representations, express or implied, other than as set forth in this Agreement. The terms of this Agreement may be modified or changed <u>only</u> by a written agreement signed by all of the parties and which provides it is an amendment to it. The parties agree that Sections 5, 6 and 7 shall survive the termination of this Agreement.

   j)   <u>Representation on Authority of Parties/Signatories</u>. Each person signing this Agreement and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Agreement. Each party represents and warrants to the other that the execution and delivery of the Agreement and the performance of such party's obligations hereunder have been duly authorized and that the Agreement is a valid and legal agreement binding on such party and enforceable in accordance with its terms.

Chetu, Inc.

_____
Authorized Signature

Name:    Atal Bansal

Title:    CIO

Customer:

_____
Authorized Signature

Name:    Casey Cornwell

Title:    Owner

✓ Approved    JO

**Exhibit "A"**

**WORK ORDER**

Pursuant to the terms and conditions set forth in the Agreement for Software Development and Maintenance Services (the "Master Agreement") between Chetu, Inc. ("Chetu") and <u>Nuggets Night Vision LLC</u> ("Customer"), Customer requests the following consultant(s) be provided by Chetu.

Term of Work Order: The term of this Work Order will commence on the Start Date indicated below and will continue until terminated by either party. Either party may terminate this Work Order for any reason or no reason whatsoever, at any time by providing a two (2) week advance written notice to the other party.

Billing Terms: Each consultant is allocated as a Full Time equivalent for this Work Order and billing is fixed to 8 hours per day. The consultant(s) work Monday through Friday and alternate Saturdays.

Description of Requested Services: Offshore consultants for hourly software support, maintenance, design or development services as are identified by Customer.

Number of Consultant(s): ___2___

Consultant Hourly Rate: $__28.00__/hr

Average Cost per Week: ____$2,464.00____

Estimated Start Date: __01/12/2024__

Security Deposit: Customer agrees to pay Chetu a refundable deposit of $__9,856.00__ to begin performing under this Work Order. Since Chetu bills in arrears, Chetu will hold the Security Deposit, no interest to accrue, until termination of this Work Order; should Customer have any outstanding balance or invoice(s) at the time of termination, the Security Deposit will be applied as payment towards Customer's outstanding balance and/or invoice(s) and Chetu will refund the unapplied balance within 30 days after termination.

Approved and Accepted by:

Chetu:                                          Customer:

_____          _____
Authorized Signature                       Authorized Signature

Name: __Atal Bansal__                      Name: ___Casey Cornwell___

Title: __CIO__                             Title: ___Owner___

# citrix | RightSignature

## SIGNATURE CERTIFICATE



**REFERENCE NUMBER**
E99A4E37-C272-40F7-BD2C-C3EEE7F0DD89

**TRANSACTION DETAILS**

**Reference Number**
E99A4E37-C272-40F7-BD2C-C3EEE7F0DD89

**Transaction Type**
Signature Request

**Sent At**
01/05/2024 13:13 EST

**Executed At**
01/05/2024 16:21 EST

**Identity Method**
email

**Distribution Method**
email

**Signed Checksum**
c7b0b2f3992dc7c8d5dd1c76660c12524e062c90d976a578ede35d6b0a11ae46

**Signer Sequencing**
Enabled

**Document Passcode**
Disabled

**DOCUMENT DETAILS**

**Document Name**
Chetu - Nuggets Night Vision LLC Agreement

**Filename**
paperwork_ma_1wo_v2.pdf

**Pages**
3 pages

**Content Type**
application/pdf

**File Size**
341 KB

**Original Checksum**
4ad694d815959d83d8b4ac02f7ae7a45b1e51b1eef94375c7636fd9d463f65eb

## SIGNERS

| SIGNER | E-SIGNATURE | EVENTS |
|---|---|---|
| **Name**<br>Contracts TEam<br>**Email**<br>contracts@chetu.com<br>**Signer Sequence**<br>2<br>**Components**<br>2 | **Status**<br>signed<br>**Multi-factor Digital Fingerprint Checksum**<br>86b97f396a3564416493a489af834339608881e6ed5977c8a64b2724e28c8dd4<br>**IP Address**<br>170.55.182.210<br>**Device**<br>Chrome via Windows | **Viewed At**<br>01/05/2024 16:18 EST<br>**Identity Authenticated At**<br>01/05/2024 16:21 EST<br>**Signed At**<br>01/05/2024 16:21 EST |
| **Name**<br>Casey Cornwell<br>**Email**<br>info@nuggetsnightvision.com<br>**Signer Sequence**<br>1<br>**Components**<br>6 | **Status**<br>signed<br>**Multi-factor Digital Fingerprint Checksum**<br>603bd615a111f246d0436eeaf768428dc9eff985b449d5e6c6a791822daaa1d8<br>**IP Address**<br>216.138.45.136<br>**Device**<br>Chrome via Mac<br>**Drawn Signature**<br><br>**Signature Reference ID**<br>3A354068<br>**Signature Biometric Count**<br>2 | **Viewed At**<br>01/05/2024 13:16 EST<br>**Identity Authenticated At**<br>01/05/2024 13:17 EST<br>**Signed At**<br>01/05/2024 13:17 EST |
| **Name**<br>Chetu Sales<br>**Email**<br>et2rs@chetu.com<br>**Signer Sequence**<br>0<br>**Components**<br>11 | **Status**<br>signed<br>**Multi-factor Digital Fingerprint Checksum**<br>570fe2201bb4d323eae8e192fdad6c969edd378fac10402a63598d6d73d08743<br>**IP Address**<br>170.55.182.210<br>**Device**<br>Chrome via Windows | **Viewed At**<br>01/05/2024 13:13 EST<br>**Identity Authenticated At**<br>01/05/2024 13:16 EST<br>**Signed At**<br>01/05/2024 13:16 EST |

## AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 01/05/2024 13:13 EST | Chetu Sales (et2rs@chetu.com) created document 'paperwork_ma_1wo_v2.pdf' on Chrome via Windows from 170.55.182.210. |

| TIMESTAMP | AUDIT |
|---|---|
| 01/05/2024 13:13 EST | Chetu Sales (et2rs@chetu.com) was emailed a link to sign. |
| 01/05/2024 13:13 EST | Chetu Sales (et2rs@chetu.com) was emailed a reminder. |
| 01/05/2024 13:13 EST | Chetu Sales (et2rs@chetu.com) viewed the document on Chrome via Windows from 170.55.182.210. |
| 01/05/2024 13:16 EST | Chetu Sales (et2rs@chetu.com) authenticated via email on Chrome via Windows from 170.55.182.210. |
| 01/05/2024 13:16 EST | Chetu Sales (et2rs@chetu.com) signed the document on Chrome via Windows from 170.55.182.210. |
| 01/05/2024 13:16 EST | Casey Cornwell (info@nuggetsnightvision.com) was emailed a link to sign. |
| 01/05/2024 13:16 EST | Casey Cornwell (info@nuggetsnightvision.com) viewed the document on Chrome via Mac from 216.138.45.136. |
| 01/05/2024 13:17 EST | Casey Cornwell (info@nuggetsnightvision.com) authenticated via email on Chrome via Mac from 216.138.45.136. |
| 01/05/2024 13:17 EST | Casey Cornwell (info@nuggetsnightvision.com) signed the document on Chrome via Mac from 216.138.45.136. |
| 01/05/2024 13:17 EST | Contracts TEam (contracts@chetu.com) was emailed a link to sign. |
| 01/05/2024 16:18 EST | Contracts TEam (contracts@chetu.com) viewed the document on Chrome via Windows from 170.55.182.210. |
| 01/05/2024 16:21 EST | Contracts TEam (contracts@chetu.com) authenticated via email on Chrome via Windows from 170.55.182.210. |
| 01/05/2024 16:21 EST | Contracts TEam (contracts@chetu.com) signed the document on Chrome via Windows from 170.55.182.210. |